Court is going to give each of you five minutes of uninterrupted time, and we don't always do this, but we thought it would be appropriate here. So this is a matter of CBS versus the Federal Communications Commission, Mr. Korn Revere. Thank you, Your Honor, and may it please the Court. I'm Robert Korn Revere for the petitioners. With the Court's permission, I'd like to reserve five minutes of my time for your follow-up. Thank you. Your Honor, this Court should once again overturn the FCC's $550,000 forfeiture imposed on CBS for its 2004 broadcast of the Super Bowl halftime show for at least three reasons. First, nothing in FCC versus Fox television stations alters this Court's finding that the FCC for three decades has treated words and images identically under its broadcasting decency policies. The Fox Court's reference to language in one 1987 FCC order is victim, but does not affect the central issue in this case, which is whether the Commission ever articulated or applied a change in policy with respect to brief and unintended images prior to the Super Bowl broadcast at issue here. Now, we acknowledge that language in Supreme Court's decisions requires close attention and the respect of circuit courts, but as this Court has held in various cases, such statements are not controlled where they are made in a different context as they were here. The brief passages in Fox, upon which the FCC now relies, were never articulated or applied as the change in policy that is now asserted. They were not mentioned in the decisions under review in this case or in any other FCC decision for the purpose cited here. The Supreme Court in Fox simply had no occasion to address the application of the FCC's indecency policy to visual material. Second, even if the FCC's policy change were to survive scrutiny under the Administrative Procedure Act, and we submit that it does not, no forfeiture still may be imposed where the Commission's policy statements are unclear or where the agency itself struggles to provide a definitive reading of its rules. Cases such as Trinity Broadcasting versus the FCC have applied this basic principle of due process, as has the Commission itself in cases such as Golden Globes. Here, the FCC may not impose liability on CBS for an obscure statement in a decision that went undiscovered even by the Commission until late 2006, more than two and a half years after the Super Bowl broadcast. This case is entirely distinguishable from Fox on that basis alone. No fine was imposed in that case, which is a fact that the Supreme Court cited repeatedly in support of its decision. No such argument can be made in this case. Third, this Court's initial decision is further supported by independent grounds that likewise are unaffected by the decision in Fox. This includes the holding that the Commission incorrectly imposed liability on CBS for the independent actions of Janet Jackson and Justin Timberlake. The Court should reaffirm its finding that the First Amendment requires a showing of scienter but should forego involving CBS in an unnecessary and burdensome remand proceeding at the FCC. If the Commission wants to clarify the statutory basis for imposing forfeiture under Section 503 of the Communications Act or if it wants to define what constitutes a reckless or willful violation of its indecency policies, that's fine. There's simply no reason to include CBS in that proceeding and no reason to punish CBS for the FCC's lack of clarity on those points. Before involving CBS in such an extended proceeding, this Court should first rule on the arbitrary nature of the nebulous and ever-changing factors the Commission employs to make indecency findings as well as the fact that the FCC's newly restrictive approach violates the First Amendment under Pacifica. It has been six long years since the 2004 Super Bowl and the chilling effect of such extended and perpetual government oversight of protected speech is significant. We have come a long, long way from the restrained enforcement policy that the Supreme Court's Pacifica ruling was based on. As Justice Ginsburg wrote in Fox, echoing sentiments from what appears to be a majority of the Court, there is no way to hide the long shadow that the First Amendment casts over what the Commission has done. Going to the first argument, nothing in Fox alters this Court's initial holding. The language that is quoted in Fox is in a background discussion of that decision and can be deleted from the decision without seriously impairing the analytical foundations of that holding. That's how this Court has defined what dictum is, language that is not essential to its outcome. In Fox, the Supreme Court focused on the 2006 orders of the FCC as well as the 2004 Golden Globes order and said that those expressions of policy did recognize and express change from the FCC's prior policies. And ultimately, the Court upheld the FCC's decision under the APA narrowly because it found that the words used in Fox have the power to offend. Secondly, that isolated words could be considered patently offensive under Pacifica. Third, that even isolated utterances could be pandering or vulgar and shocking and amount to what the Court described as a harmful first blow. You make a strong argument that the language that we've identified and that both parties have identified might be characterized as background, but it's Supreme Court background. And how do we ignore it, particularly when it seems to fly directly against what this Court found? Let's assume that we still think that our initial interpretation was the correct one. Let's assume that we even think that your reading of Fox is the correct one. We still are butting our heads against what the Supreme Court said about Pacifica. And if you could just spend a few moments to tell us why we should ignore that. Certainly, Judge Sirica. And we're not asking the Court to ignore the reference to the 1987 Pacifica decision in the Fox decision. What we're asking is for the Court to look at the context in which the Commission made those decisions and then how those decisions got presented to the Supreme Court to understand what that means in light of this Court's earlier decision. In looking at Supreme Court language similar to this, this Court in cases like Official Committee of Unsecured Creditors of Cybergenics Corporation v. Chenery have said that we must not be guided by a single sentence, but we need to see if the case at bar is the situation that the Court's dictum anticipated. And in this case, looking at the reference to the 1987 Pacifica decision, it's important then to look at what those decisions actually were. That's because the FCC has historically defined its policy in its indecency area by what it calls case comparisons. So simply looking at the sentence that the FCC plucked out and then that got presented up the line in the Fox cases doesn't tell you what those policies were. You have to go back and look at what those decisions actually were getting at. The 1987 Pacifica decision was distinguishing two different complaints, one involving an extended discussion of sexual activity in the presentation of a play on the radio, and the second one, which was dismissed, was one involving brief, unscripted, and spontaneous descriptive language that the Court then distinguished and said it was not going to find to be actionable. It wasn't that the Court or the FCC was distinguishing literal versus non-literal uses. It wasn't distinguishing images from language. It was simply saying that when it refers to expletives and dismisses the complaint under its well-established policy, it was talking what the Commission had always been talking about in the past, and that was unintended, unscripted outbursts. What is a literal description or depiction, and what is a non-literal expletive? Where in the FCC opinions or in jurisprudence is there some kind of definition of how we find – I mean, expletive could be defined as an exclamation. I'm not sure if it's – I don't know if it's definitely words or if there can be an image that could be deemed an expletive. I don't know. Judge Rendell, I think you put your finger on one of the essential problems here because the FCC never really confronted the issue of literal expletives or just non-literal expletives until the Golden Globes case where it was trying to distinguish the staff decision that said that the words used in that case were used in a non-literal way. There's nothing in the fleeting material policy in the past that tried to define what was literal versus non-literal. Again, that didn't come until the Golden Globes case, and that's why it appeared in the Fox decision because on review both before the Second Circuit and then ultimately before the Supreme Court, those decisions, the Golden Globes decision and the Fox decision sort of got wrapped into one. And so the staff's distinction in Golden Globes about Bono's non-literal use of a word became part of the court's analysis, but it was never part of the history of FCC decision-making in this area. And it certainly wasn't part of the 1987 Pacifica order, but because the Supreme Court in Fox was looking at the explanations that finally came together in the omnibus remand order in November 2006, it looked at this issue of a non-literal expletive. I thought the question was what is the difference between a literal description and a non-literal description? Can they be differentiated? As I understand it, the way the FCC has tried to refer to it is to say that if a presentation of language is actually describing sexual or expletory activity, that is a literal usage, whereas in certain contexts of expletives it is not actually referring to sexual activity or expletory activity, but in fact is just a word that's used as a euphemism. And because of that, it's still considered to be, as it explained in Golden Globes and later in the omnibus remand order, it's still considered to be offensive under its policy, but that's where it was explaining its change in policy. Can those terms be applied to images? That's the position that the FCC is trying to get to now, to say that if you're dealing with images, then it's necessarily a literal usage. But that's not the policy that the FCC had ever applied in the past. It has treated images and language interchangeably. In fact, as this court pointed out in the prior decision, that's because of the language of Section 1464 itself. It doesn't distinguish between the two and just talks in terms of language and utterances. And so, again, the commission has tried to say that images are different there by necessity, literal, but you won't find that in any prior FCC decision, which is why in their briefs in this case, the commission itself has turned to a dictionary definition to say that if you're talking about depictions, that's necessarily visual. And yet the same dictionary definition goes on to say. Let's say in the underlying opinion that the commission has not differentiated between different categories of broadcast material, such as images and words. That's correct. So it has treated both of those categories the same. That's right, which is why the relevant distinction for purposes of fleeting material has been, as the commission described in 1987 and throughout, whether or not it was spontaneous, scripted, planned, whatever. And all of the cases that the FCC has cited over time really break down in those categories. If they have been treated the same, how do we analyze the two categories? I mean, is it the fleeting nature of images or words that we should focus on, or should we consider somewhat of a contextual analysis to determine whether the words or phrases are actionably indecent? I think that it's important for the court to use a contextual analysis, but as that term was understood originally in Pacifica and applied by the FCC, when the Supreme Court was talking about the contextual… In other words, it's not just the fleeting nature of the words or images that matters. It's whether they're graphic, offensive, et cetera. Well, it is the fleeting nature in the way that the Supreme Court was dealing with it and the way the FCC argued the case at the time. It was saying that when you're dealing with material that is unplanned, where you have a breaking event, where there's no time for editorial judgment, that it would be unfair to apply the policy against a broadcaster in that circumstance. That's the contextual factor that the FCC had argued to the Supreme Court and the Supreme Court accepted in the Pacifica case, and ultimately what the contextual factor that the FCC focused on subsequently in the WGBH case, in the 1987 Pacifica order, and others. Those were the contextual factors. It was not focusing on, as the Commission tries to do now, a content-based notion of contextual factors, leaving the FCC free to apply those contextual factors in any way it chooses. That sounds very persuasive to me. That's not what the Supreme Court said in Fox. And I think your argument on inconsistent application is an intriguing one, but before we finish through with that, could we go back to the articulation of the standard? Because as you said in the beginning, you think that either on the articulation basis or on the as-applied basis that you would prevail here. Again, tell me how I deal with the language in Fox that says, deliberate and repetitive use is a requisite to a finding of indecency when a complaint focuses solely on the use of non-literal expletives. Solely. That is language that's taken directly from the 1987 Pacifica decision, and it was quoted to the Supreme Court in the Fox case, and the Court in Fox quoted that as part of the background section. I think what this Court should do with it is look at the context in which the Fox Court was looking at that language. So we're not to read it literally? Well, I think the key term here is what is an expletive? Because the FCC never defined what it meant by expletive, and the Supreme Court in that passage isn't talking about what an expletive is. The FCC tries to say that that's confined only to literal meanings, but if you look back at the decision that is referenced here and quoted to the Supreme Court, the relevant distinction that the FCC was drawing was that an expletive was what is unplanned and unscripted and unintentional, and not just because it's brief. That's a factor that it looks at, certainly, but the relevant factor for applying its fleeting material policy was the fact that it was not something that the broadcaster set out to do, and therefore it would be unfair to apply the standard here. And then, therefore, for the FCC to now draw a distinction based on expletives versus descriptions and to argue that in front of the Supreme Court and have the Supreme Court cite that language still doesn't tell you, again, what that distinction relates to unless you define the term expletive, and that's something that the FCC has never done. Well, and Fox also talked exclusively about language. Well, that's right, and you look at those cases and you know that they're talking exclusively about language. Now, Young Broadcasting had to do with nudity and imagery. How does that case help you or hurt you? I think Young Broadcasting is neutral. Well, actually, in a way it helps because it shows that the FCC never applied the policy in this way. It doesn't cite the 1987 Pacifica language as a change in policy. It takes 16 pages to get to that discussion. Young Broadcasting also supports that reading of expletive being the unplanned because the analysis of the FCC was that this really wasn't unintended or fleeting because the broadcaster brought in these performers that it knew were going to be nude under their capes. It asked for them to... they were urged off-camera to perform their act. For all of those reasons, it wasn't the scenario that had always applied under the fleeting materials policy of the unplanned or the unexpected. Was the analysis in Young, though, a contextual analysis or a fleeting analysis? That is, wasn't the fleeting analysis part of the contextual analysis with pandering and graphic display? The FCC did... And if that's right, then does that not undermine your argument? Not necessarily, Your Honor, because, again, the way that the commission set about distinguishing the fleeting materials cases was to say that they didn't involve the same kind of intent or the same kind of potential planning of the exposure. But even if the Supreme Court's reference in Fox to the 1987 Pacifica order is considered to salvage the FCC's APA argument, it still is insufficient to apply in this case to impose a penalty on CBS because of the due process concerns recognized in Trinity Broadcasting Company. That case and cases that we also cited in our supplemental brief, including General Electric versus the EPA, explained that even if it is sufficient to satisfy the burden of explaining a change in policy under the APA, it is insufficient to impose a penalty, which is a... So if the Third Circuit got it wrong in our first opinion, then how could CBS be expected to get it right? Absolutely, Your Honor. Or anyone else, for that matter. This distinction that the FCC appears to have discovered in November 2006 went 20 years without anyone ever acknowledging it or applying it. It's really unfair to impose the standard on broadcasters to the point of significant liability for them to anticipate a change in policy that didn't even occur to the FCC until its third or fourth round of briefing and decision-making in this area. For that reason, the due process differences alone between Fox and this case justify reversing the FCC's... I'm sorry. Just let me follow up on this for a second. Was this issue argued before the Second Circuit in Fox, the inconsistent application, or was it... I understand primarily it was the vagueness issue that was the focus of the argument there. Are you talking about the most recent argument before the Second Circuit? Yes. No, the most recent one. In the most recent argument, and I guess Mr. Lewis can probably tell you much more about that argument since he was arguing that case, the most recent argument focused primarily on the vagueness issue and the constitutional question as well, since the court in Fox didn't reach the constitutional issue but essentially invited the court, the Second Circuit on remand, to look at the constitutional issue. Should we await that determination? I don't think it's necessary to await that determination. For example, either on the APA issue or because of the due process question, this court can reaffirm its earlier decision without getting into the constitutional issue. However, because of the significant constitutional issues that are involved, as we wrote in our briefs, it would be not a bad thing for this court to provide guidance both to the FCC and for all of us on the constitutional issues involved. I gather that there has never been an enforcement order issued based on an image or imaging imagery. Actually, if you go back to about 1988, there was the first time the FCC issued a fine, as far as I'm concerned, for broadcasting involving KZKC, which we cite in our briefs. This was the broadcast of an R-rated movie on a local television station. The FCC issued a notice of apparent liability but quickly rescinded it based on the D.C. Circuit's review of the overall change in policies in Act I. One of the things that the FCC said in its notice, in public notice, acknowledging that decision, was that it imposed this fine because the images were not fleeting, because they were not just... But Judge Sharika mentioned that fleeting nature of the words or images may be one of the factors. We did mention in our underlying opinion, footnote 10 of our opinion, we laid out that in its 2001 policy statement, the Commission described the principal factors that have proved significant in its decisions to date. The fleeting nature of the words or images was but one factor. Other factors were the explicit or graphic nature of the description. And there were other factors. My question to you is, isn't that statement sufficient to put CBS on notice that this type of conduct might be actionable? In isolation, perhaps, but not in the context of the FCC's history of not imposing forfeitures in this area, as explained going back to the Pacifica ruling. The same is true of the safe harbor for time, the time-channeling safe harbor, where you don't impose or it's not actionable if you put on material that's considered to be indecent after 10 p.m. Those factors simply would not apply to something in that safe harbor. And for the same reason, with the FCC's initial explanation... There's never been a safe harbor for nudity. I mean, nudity is what you see on television. It happens. It's very sudden. It's not scripted. I mean, the FCC has never issued a policy statement where a safe harbor would be considered for images or nude displays on broadcast television. Other than its general statements that it's unfair to impose a penalty on a broadcaster for the unexpected, that's really what the policy statement was. It wasn't changed by the 2001 policy statement, which laid out various factors. The last time this court looked at the policy statement, it chided the FCC for taking those references to images out of context, saying that otherwise the policy statement simply confirmed that the commission has treated images and words identically in the history of its broadcast indecency enforcement policies. Do you think how fleeting the conduct is might make a difference? I mean, it seems like, well, fleeting may be just very quick, but there's fleeting and then there's fleeting. There is. There's fractions of a second. And in this case, it was nine sixteenths of a second. And the record demonstrated that it was truly unplanned and unexpected on CBS's part. There may be other circumstances where the facts show that it wasn't so unexpected or unplanned, which is what the commission was trying to get at in the Young Broadcasting case, saying that in that case it wasn't just something unexpected, that instead it was something that the broadcaster brought people into the studio and took the severe risk that that might happen. I'm not trying to say that that necessarily is something that would be indecent, but it's something that certainly distinguishes this case, and I think Your Honor's question about what may be fleeting, from the situation involving the Super Bowl. My understanding on the inconsistent application argument,  they have declined to go ahead and press cases for fleeting images. But in doing so, at least in the great majority, if not practically all of them, they've done so under the contextual analysis. That is, they've weighed the fleetingness against the graphic part and the pandering part. And that's been the reason. Ebony, would you please put the light off? I can see we're going to go over time here with both. What's your response to that, that essentially there hasn't been inconsistent application because the commission has simply been weighing fleetingness along with the other two factors? That isn't borne out by the actual decisions of the FCC, where they have talked about how they apply this policy. But if you look at the cases in which they have dismissed complaints involving fleeting material, it really goes back to the original factors that the FCC described in its 1975 and 1976 Pacific Orders. It went to the unexpected. That was the entire defense that the FCC made for its indecency policy, saying that it understood that it was less clear than obscenity. It understood that it was intruding on an area that may involve very significant First Amendment rights. But in exchange for that lack of clarity, it applied what it described as a cautious enforcement policy. And part of that cautious enforcement policy was not to enforce the law, where in those cases where the broadcaster was caught unawares or caught off guard and couldn't be blamed for not being able to exercise editorial judgment in the short time available. And so all of the decisions that you reference referring to the 2001 policy statement really drew the same line, looking at the fleeting nature in the context of whether or not it was something that was unexpected for the broadcaster. And again, the last time this Court looked at the FCC's explanation of its 2001 policy statement, it said that the reference that it made to that policy statement, when read in its original context, rather than in its isolated statement, this sentence does not support the Commission's assertion here. It says the Commission has simply substituted new rationales in the wake of the Golden Globe Awards case and the Omnibus Order for the earlier decisions involving fleeting material. I take it that obviously you would like us to essentially reaffirm our original decision. If we do not agree with you on the articulation of past FCC policy, then you would like us to find that they applied that policy inconsistently and that you weren't on notice and that there's due process concerns there. I gather you also want us to, if we think it's proper, to reaffirm the decisions on independent contractor and SIETR. Am I correct on that? Yes, Your Honor. And actually, if the Court does, in fact, disagree with us on the Administrative Procedures Act issue or on the due process issue, then I might take up Judge Rendell's suggestion that we wait until we hear from the Second Circuit before going forward. That was not a suggestion. That was a question. Well, that's the caveat to my answer then, to say that if the Court does disagree with us, then I think the inside of the Second Circuit might be helpful. But yes, Your Honor, I think there are independent grounds that if the Court disagrees on due process or on the APA, then still it would be unfair to hold CBS responsible for the broadcast. What about the vagueness issue? You raised that initially. We did not deal with it. You would want us to press ahead with a consideration of your vagueness challenge as well. Yes, Your Honor, and that really takes two forms. As we argued in our initial briefs, both as an APA issue, a substantive APA issue, saying that the FCC's application of its policy is arbitrary and capricious because it is utterly inconsistent and standardless and also in violation of the First Amendment, even under the standard set down in Pacifica. Let's just spend a minute on that. What would make it less standardless in your view if, you know, the pandering part and the repetitive part are extensiveness or fleetingness? How would you cut this down if you were going to write a more specific standard? I think the easiest way to do that is to pattern something more like the obscenity standard where you have distinct standards. I'm not saying that it has to be the Miller standard, but rather in applying the Miller standard, courts apply the three-pronged test of the Miller as discrete issues, each of which has to be met. In the FCC's revision of Miller as applied to its indecency standards, it's argued that it's various factors, the graphic nature of the material, whether it's repeated or dwelt upon, whether it's pandering, all interrelate so that it can find essentially whatever it wants simply by saying at its own whim, one factor outweighs the other. And so I think having a test that actually requires it to be a test rather than an impressionistic view of the commission, saying that one factor simply outweighs another without any further explanation, that alone would make the test clearer. I don't know that it's going to be sufficient to satisfy the Supreme Court ultimately on the vagueness issue, but it certainly would be an improvement upon what the commission has done. Is there finding that the graphic nature of the display and the pandering aspect of the contextual analysis is entitled to some deference? Well, the FCC is entitled to some deference. If we're talking about a constitutional question, then no. If it's a First Amendment analysis, then this court does not defer to the FCC. If we're talking about an interpretation of the FCC's prior policies, then this court would be deferential, but not to the point that it accepts a commission revision or a post hoc rationalization for what it has done in the past, when in fact that isn't a real representation of what the FCC's policies have been. I'd like to ask you about the scienter issue. And as you know, we decided to remand this matter to the FCC, and we stated in our underlying opinion that minimally recklessness was a standard that the FCC could consider. The statute 1462, I believe, does reference willful conduct, which is a higher standard for the FCC to meet. Could you comment on which standard should be the correct standard and if we should remand the case for a decision one way or the other? Well, as I stated at the outset, Judge Fuentes, our view is that a remand, including CBS in a remand, is not necessary, because particularly if the court reaffirms either on the APA issue or on due process question, then involving CBS in the remand is really unnecessary. But that being said, if the FCC does go forward, and it certainly can go forward and define what it means under the statute, we think that, first of all, it should clarify whether it is proceeding under Section 503B1B or 503B1D, which would define whether or not the standards applicable to Section 1464 apply. The amicus brief filed by Fox, I think, has a very good analysis of this issue, saying that the higher standards do apply that require an actual showing of intent to violate the standard. Now, in the Court's earlier opinion, when it was talking about the standard of recklessness that would apply, it cited to the Supreme Court's decision in Osborne v. Ohio, and that in that case you could impute the recklessness standard from a general state statute and thereby salvage a state criminal statute on child pornography. I think the important thing from that decision to apply, and it relates to the question of remand, is the secondary decision in Osborne, which reversed the conviction in that case because the standard of scienter had not been applied to all elements of the offense. I think this underscores a point that Judge Randall made in her dissenting opinion, saying that what is important is that the FCC is required to show scienter with respect to each element. I can understand where willfulness is a lot easier to do than reckless conduct. Constitutionally, would recklessness be sufficient? The last time I was here in the oral argument, I was talking about recklessness in the context of First Amendment cases such as New York Times v. Sullivan, where you have to have actual intent or reckless disregard. I think that the recklessness standard that the Court was discussing in the opinion was somewhat less than that. But I think the Commission itself acknowledged that the standard probably should be willful blindness in the oral argument last time. I think that is a standard that if you apply it to this case, you'd reach the same outcome, and that is no penalty for CBS. There you would have to show, according to Third Circuit decisions, a conscious purpose to avoid learning anything about the situation that might lead to liability, that it wouldn't be sufficient to have simple negligence or even stupidity would not be enough. And I think that standard, whether or not the Court resolves what the ultimate standard would be, since that's something it's asked the Commission to do, that one is a standard that certainly would reach the same outcome here. I think the record fully demonstrates that whatever else may have been going on, there was not willful blindness or, in that sense, recklessness on the part of CBS. The record is nearly 5,000 pages. It's undisputed that CBS didn't approve, plan, or even have knowledge of the stunt, and that it took reasonable precautions that any broadcaster would take to avoid unexpected events during a live broadcast of this type. Any other questions? Thank you very much, Mr. Barber. Thank you. Mr. Lewis. May it please the Court. The Supreme Court's decision in Fox confirms what the government has argued all along. There has never been a fleeting images exception to broadcast indecency enforcement. Perhaps some of the confusion comes about because the Commission has applied, throughout the history of broadcast indecency enforcement since Pacifica, a general contextual analysis. According to which, the fleeting nature of the image or any material is relevant. The question here is whether or not there's a per se exemption. So let's go back to 1987 in the Pacifica order and actually look at what the Commission did in the Pacifica order. In that order, what had been happening after Pacifica, the Supreme Court decision in Pacifica, and until 1987, the Commission had applied its enforced broadcasting decency rules in a very narrow way. It virtually, as the Commission explained in the reconsideration order in 1987, virtually limited its enforcement to cases which actually contained repetitive repetition of the precise expletives that were issued in the Carlin monologue that was issued in the Supreme Court case. In 1987, the Commission changed its policy. It said, look, that's too narrow an interpretation. It's inconsistent with our statutory responsibilities. We are going to make clear and we are announcing to our regulated entities that no longer will we have such a narrow enforcement policy. We are going to broaden this out and apply the contextual analysis that the Supreme Court affirmed and approved in Pacifica itself, patently offensive descriptions or depictions of sexual or expiratory activities or organs. We're going to apply that contextual analysis across the board. However, it made clear it preserved the repetition requirement, which it had been applying up to then, with regard to a narrow category of words and words only, non-literal expletives. Now, that's what happened if one reads, it's clear from paragraph 13 of the Pacifica order in 1987 that that's what happened, but you don't have to take my word for it. The Supreme Court in Fox described precisely this change in explication of policy in the Supreme Court's decision in that case. So on page 1807 of the Supreme Court's opinion, although the Commission had expanded its enforcements beyond the repetitive use of specific words or phrases, it preserved a distinction between literal and non-literal or expletive uses of evocative language. The Commission explained that each literal description or depiction of sexual or expiratory functions must be examined in context to determine whether it is patently offensive, but the deliberative or repetitive use is a requisite for a finding of decency when a complaint focuses solely on the use of non-literal expletives. Our point here is that in 1987, the Commission preserved the distinction and created, in effect, a carve-out for a limited class of words and words alone. So one doesn't really have to struggle in this case between the distinction between a non-literal and a non-literal expletive and a literal depiction or description. The point is that's a battle that's fought in the class of words. Images were never subject to that per se exception. Now, it's true that when one looks at the actual distinction that the Commission set forth, the preservation, you find a distinction between non-literal and descriptive. And our point in the briefing about the message or the implications for images is that if one were to try and fit images into that category that was created for words, you would put images on the descriptive side of the line, which also fell outside the per se exception. The exception only applied to non-literal expletives. Images are not expletives, and they are not non-literal. They are descriptions. So that's why it's very important. The Supreme Court's description of paragraph 13 of the 1987 Pacific Order confirms what we've argued all along. In 1987, the Commission expanded its enforcement. Contextual analysis was across the board. It had one limited carve-out. That carve-out was eventually eliminated in Fox as making no sense. And that's why it's important also to read the Fox decision because that wasn't simply inside by the Supreme Court. That description of Commission policy was a critical setup to the Supreme Court's affirmance of the Commission's APA power to change its policy. And the underlying assumption, and again, if I could read from the Fox decision, it talked about, at page 1812, the agency's reason for expanding the scope of its enforcement activity, and this was when the agency eliminated that carve-out, was entirely reasonable. It was certainly reasonable to determine that it made no sense to distinguish between literal and non-literal uses of offensive words, requiring repetitive use to render only the latter indecent. So the Supreme Court could not have reached its decision that the Commission's change in policy in the Fox case was reasonable without describing what the prior policy had been. And so that's our point. This isn't simply a discussion in the background section of a victim in a Supreme Court opinion. That background section discussion was critical to the court's holding of the case. So that's point number one on the Commission's per se exemption. If that exemption applied, only defeating extratives. So in this case, once you take out the argument that there was a fleeting images or a fleeting materials policy, there was nothing for the Commission to explain. The Commission's order cannot be invalid on the basis of a failure to explain a policy that never existed. Let me ask a question, Mr. Lewis. You say, looking back, that it is clear that this is words and words alone. And I'm not sure where it says that. But it seemed to me that in Young Broadcasting, there was the opportunity. I mean, in Fox and in Pacifica, we're talking about speech. In Young, we're talking about nudity. And there was the opportunity for the Commission to say, as you say in your brief, and I quote your brief, a spoken vulgarity simply cannot be analogized to the display of a person's sexual organs. That's what you say in your first brief in this case. But in Young Broadcasting, the Commission addressed the fleeting nature of the exposure here, saying that it occurred for less than a second, saying it was fleeting. And then noted, however, that it was intended to pander, titillate, and shock. And then says, thus, we reject Young's assertion that this material is equivalent to other instances in which the Commission has ruled that fleeting remarks in a live unscripted broadcast do not meet the indecency definition. And in the footnote 35, it explains how the expletives, the fleeting expletives in other cases, were not intended to pander and titillate. But it drew no distinction between an image of nudity that is fleeting and an expletive that is fleeting, but said instead they're all really grouped together. They're the same, but do not pander or titillate, and we will find differently. In other words, it almost opened the door to probably what was going to happen in Golden Globes, but it did not – it had the opportunity to say nudity is different. Well, it didn't. It said this fleeting exposure is different from the other fleeting expletives because here it's to pander. So I'm trying to figure out how yours to be CBS or anyone's to be put on notice, aha, as you say, a spoken vulgarity cannot be analogized when in your very own opinion where you have imagery, unlike Fox, unlike Pacific. You have imagery when the SEC itself does not draw any distinction at all between the two fleeting things. Well, the first point is Young actually, the decision in Young does draw that distinction because in Young the commission found that the fleeting image there was indecent. Because it was the pandering or titillating, it's almost moving to the next step and saying, but aha, and if those expletives in the footnote had been pandering, it's telling us that those expletives, although fleeting, might have been problematic. So it's saying something different, but it's not drawing the distinction between them that you're telling us exists. Where does it exist in cases involving nudity imagery? Where has the FCC said that? Actually, I think that's the wrong question because, and as I said before, the confusion stems from the fact that the contextual analysis has always applied across the board. Fleeting has always been relevant. Well, the fleeting has been relevant, and fleeting is relevant both in nudity and in expletives. Exactly correct. But here CBS is relying not on that fleeting is relevant, but that fleeting is an exception, an exemption, that there's no further analysis that needs to take place when any material is fleeting. But that's not been the commission's policy. Tell me where it's not been the commission's policy with respect to imagery. Here's what the commission's policy was. We will examine the indecency of material according to a contextual analysis in the 2001 industry guidance that the commission set forth a number of factors. The second factor is a factor which says fleeting will be relevant. Fleeting will be relevant for words. Fleeting will be relevant for images. In 1987, the commission made clear there's a narrow exception to that contextual analysis. It applies to non-literal expletives. It did not say, the commission did not say in 1987, it specifically said that descriptive words were going to fall outside the exception. What is a non-literal expletive? I'm sorry? What is a non-literal expletive? I think Mr. Kornrevier had the description basically correct. It's a use of an expletive, which perhaps invariably has a sexual meaning, but it's not used in the particular context to describe sexual activity or a sexual organ. So that distinction, and by the way, that was, those were the... Like what Bono said. Or like what George Carlin said, which was really the context in which the commission in 1987 wanted to make clear that it was not diverging or wanted to preserve the requirement that with regard to those kind of expletives, there had to be repetition. But with regard to everything else, that's what the 1987 orders say. We are expanding our enforcement to apply a contextual analysis across the board. That across the board included all the images, and it included some words as well, descriptions or depictions. So the point is, it should be, there should be no surprise that in cases after 1987, the commission applied the same kind of analysis to images as it did to words because the contextual analysis, that's what it was applying. That contextual analysis applied equally to both. So what's surprising, I think, if you're going to take Mr. Kornrevier's argument, is he's surprised by the idea that Young Broadcasting took so much time to come to the conclusion that this was indecent. Had the commission issued enforcement orders for anything other than pleading words or images? Since 1987? For anything other? Oh, yes, there's been many cases of non-pleading images. I think the example of the Schindler's List case where the commission found contextually that the images there were not indecent was a non-pleading image case. The images there were by no stretch of the imagination pleading. But pleading images or pleading material is a subset, usually a narrow subset, of the indecency cases the commission has had before. So the fact is here what CBS has to show is that there was an exemption to the contextual analysis that gave them a free pass, as it were, because the image was pleading. Our point is there was a narrow exception in place at the time. It applied to non-literal expletives. It never applied to images. Once you get to the contextual analysis for the CBS Super Bowl show, CBS really doesn't make a serious argument that if they don't have an exception that the commission was somehow unreasonable in finding that that was indecent under the commission's contextual analysis. The commission explained in this order that while the images were pleading, because of the other factors, the other factors outweighed them in terms of determining whether it was patently offensive. And it's easy enough to see that if you say, assume CBS had actually scripted the show the way it went out. If people sat around a table and said, I have a great idea for the end of the Super Bowl halftime show, we'll have Justin Timberlake rip off the bra cup of Janet Jackson at the very end of their dance number. But guess what? We'll just put it on screen for a second. Now, nobody really can make a serious argument that the commission would have been unreasonable to find that to be indecent. So unless CBS has this exception, they really have no objection to the commission's indecency determination. Now, they make a different argument. They make an argument that, well, this was all very confusing and we didn't really have any notice. And the commission has acknowledged that when there was no reason for a regulated entity, a broadcaster, to know that the commission's policy was a certain way, then it would be a violation of due process to impose a forfeiture. It seems, though, Mr. Lewis, that the fleeting material exception seems to be the norm, not the contextual analysis. Well, I think that's not right, Your Honor. I think that the commission, what was the norm that was in prior cases, the commission had generally found that fleeting material was not indecent. But there's no case that said we're finding that because we're applying an exception. All of the cases are perfectly consistent with the commission's... But that seemed to be the case in the George Carlin monologue, in the Bono statement, in the Nicole Ritchie statement, all having to do with fleeting exception, not the contextual analysis. Fleeting words. Those were words cases. And George Carlin was the epitome of a non-fleeting expletive case. But the Bono and Nicole Ritchie cases were words cases. And that's the whole point of the Fox decision. Yes, the commission did change its policy with regard to fleeting expletives, non-literal uses of words. What case says that pictures are different? What case says that images are different from words? Well, we have cited a case from the Third Circuit in a different context which repeats the attitude. No, I'm saying that the FCC said words are different from pictures. I think there's no case that expressly says that. The fact is the commission's analysis applied the contextual analysis to images, and there is no case that says there was a fleeting image exception. And really the burden is on CBS, not on the commission. The commission found here that it interpreted its prior precedent as not embodying this policy. This court disagreed. The commission has come back with the Supreme Court's recognition that there was an embodiment of that, or at least a commissioned statement that is entirely inconsistent with the notion that there was a fleeting material policy across the board. That 1987 Pacific Order, which draws a distinction between expletives and descriptions, is entirely, even though it involved words, is entirely inconsistent with the notion that the commission had a fleeting material policy. But if there was any doubt, the Young Broadcasting case, which came before the Super Bowl, stated exactly that. There was a fleeting image in that case, and the commission found that that fleeting image was indecent. The broadcast of that image was indecent. This court said, well, that was a divergence from the prior policy, but there was no prior policy. But putting that aside, because we think that the clearest statement of why there was no prior policy was the 1987 Pacific Order, and now confirmed by the Supreme Court, Young stands for unmistakable notice to CBS. Before the Super Bowl, there was a decision the commission issued, an NAL, that said, here's a fleeting image, here we found it to be indecent. So I don't see that CBS... I think CBS had noticed in 1987 that there could not have been a fleeting images policy, but they also absolutely had noticed by the Young decision, which came down before the Super Bowl. But Young turned on the intent to pander, titillate, and shock. And indeed, if that hadn't been there, the fleeting nature of the image would have been just fine, wouldn't it? Fleeting is always relevant. You're absolutely right, Your Honor. And there are many cases in which the commission has found that there is no pandering, there is no titillating, the nature of the image is such that it wasn't graphic or explicit, it was in the background. But fleeting is always relevant. But the pandering, the titillating, was the only basis on which the FCC distinguished it from other, quote, fleeting remarks in live, unscripted broadcasts. Yes. That's because there are other factors besides fleeting. Fleeting is not the only factor. Fleeting is a factor, but it's not the only one. So in some cases, the balance will come out differently. Has the commission come to the conclusion that either words or images were fleeting and has penalized or issued a penalty for exclusively fleeting images or words? Well, I think that the Fox case involves words that were arguably fleeting since there were only certain isolated words. But there was no penalty imposed in that case. Right. But in this case, I guess, it provides that example. Is this the first case where the commission has determined that the conduct was fleeting and has issued a penalty? Young is a case where the commission tentatively made that determination in the position of order. But yes, these cases are rare. The commission is not often confronted with a case where the image, though fleeting, is nonetheless indecent. It's just that there's a real concern to avoid excessive punishment for conduct that is accidental or spontaneous, as occurred here. Is it that way in favor of affirming our underlying opinion? Well, I think this goes to the second question about the wilfulness and the scienter questions. I think that there are really two issues in this case. One is, did the commission reasonably determine that the Super Bowl halftime show broadcast was indecent? Then the second is, should CBS be held responsible for that broadcast? They make the argument, vigorously, that they had no idea that these actions were going to occur, that the nudity was going to appear and that they would be in a position where they broadcast it. This court, I think, properly pointed out one problem with that, as the commission pointed out as well. They were under... They were considerable alarm bells in the record about divergences from both the audio and the visual script in the case. There were concerns in the record, the appendix on page 168, involves a memo talking points from the NFL to CBS about specifically noting that the NFL commissioner did not want to have to worry about what Janet Jackson was wearing or not wear. There was... Questions with regard to tearaway costumes for cheerleaders. And the most important thing was that Janet Jackson's choreographer had said days before the Super Bowl that there would be shocking moments in the Super Bowl. And CBS was under a duty to investigate those statements, but also... But there's no evidence that they actually knew  It's quite the contrary, isn't it? That's right, Your Honor, but there was evidence that they had the ability to impose a video and implement a video delay system. They never would have had... What their problem was is, for the Super Bowl halftime show, they had an audio delay system, a five-second delay on audio, which did them no good at all once Justin Timberlake ripped Janet Jackson's top off. They had no way of... Since they had no video delay, they had no way of preventing that image from being broadcasted again. Our point is, and I think this Court understood that point, that recklessness can suffice, both under the Constitution and under the Commission's statute, to hold CBS liable at least for their failure to implement a video delay system. Now, they implemented it a week later at the Grammy Awards. And this Court said, well, it's possible CBS argues that they had to invent... Not reinvent the wheel, not take it off the shelf and invent the wheel during that week. All we ask here, for present purposes, is that we allow... That this Court allow us on a remand to explore that issue further. The fact is that at page 72 of the appendix, in the footnote that discusses... Footnote 13, I think, that discusses the video delay system, CBS cites its own press release the day after the Super Bowl that said it was going to implement a video delay system. What would be the point of a remand? Now, let's say, hypothetically speaking, you don't prevail on the APA argument. What's the point of a remand? Well, there are two points. One is, this Court was not convinced by our inference that because CBS was able to use a video delay the next week that it had the video delay available at the time. I think that one point of the remand would be for us to explore that question with CBS. It certainly seems odd to say that a video delay system was not available seven days before... It's pretty much the norm now, isn't it? Sorry? It's pretty much the norm nowadays, isn't it? I don't know. You'd have to ask CBS. There are plenty of circumstances that the Commission is confronted with situations where broadcasters don't even use an audio delay. So, I don't know what CBS now does. It should be the norm. If something else happens like this, I don't know that they would have any defense. The second point is candidly with regard to this interpretation of the science required under B1B and B1D. As the Court laid out, in 47 U.S.C. 503, B1D applies to Section 1464 violations. It doesn't contain the willfulness language. In B1B, which applies to generally the violations of the rules and regulations of the Act, it does contain the willfulness violation. Our position, I think it's, at least to my mind, implicit in the Commission's order under review, that their approach was to take the higher willfulness standard, the more direct willfulness standard, and apply it both to B and to D. So, that's when the Commission took care to find that CBS's conduct was willful. You want us to adopt that as the standard? I'm sorry? You want us to adopt that as the standard? I think that the Court has explained that, as defined in the Act, willfulness involves a consciously deliberate omission of any act. The Commission found here that the failure to take precautions fell within that language of omission. And this Court has also held, I think correctly, that recklessness satisfies the scientific requirement under the Constitution, whether if B actually, assuming that B, even though it doesn't have willfulness requirements, would have some constitutional meaning. So that in this case, recklessness satisfies both B and D. But we understand that this is implicit and not explicit in the Commission's order. The Commission did not explain at length the interrelationship between, its view of the interrelationship between B and D. So that's an additional reason for a remand so the Commission can have the opportunity to explain why an imposition of a forfeiture in this case, and that's the second issue, not the indecency determination, but the imposition of a forfeiture in this case would be consistent both with the statute and the Constitution. So we don't have an objection to a remand indeed. We acknowledge that the Commission would benefit, the Court would benefit from the Commission's explanation of that statutory interpretation question. Because there are unresolved non-constitutional issues, I don't think that it's appropriate for the Court at this time to address the constitutional issues. It should await the outcome of the remand, and if the Commission adheres to its determination that CBS's conduct was sufficiently willful under the act of the Constitution to embody or provide the basis for a forfeiture, then and at that time, presumably CBS would take an appeal, the Court can address the constitutional questions. I want to note one thing. I do not see a vagueness argument made by CBS in this case on the constitutional question. Now maybe I'm missing it. I took a look while Mr. Kline was here. I thought they raised it initially. I took a look again at their initial brief, and it's true. Let's assume that they did. Well, I only wanted to point out that I don't think you can make that assumption without reexamining the briefs, because they did not make it in their supplemental briefs on remand, and I don't see them anywhere stated in the reply brief. I see cases in their opening brief that are also cited for vagueness issues, but I don't see a vagueness argument attached to them. If they made it, fine. Then obviously they can continue to press it here. But what was striking to my reading of their briefs in this case as opposed to the briefs in the Fox case is that there is certainly no heading involving a constitutional vagueness argument, and I didn't see any sentence that stated that the Commission's rules were, or authority was unconstitutional because of vagueness. They have other arguments that they make, but I think those arguments are, as I say, the Court doesn't need to address those arguments until the non-constitutional issues have been resolved. What is your position on the vagueness issue? My position is that there are two points. The vagueness issue was foreclosed by precedent, specifically itself as the D.C. Circuit later recognized in the Action for Children's Television 3 case. By the way, this is not in our briefs because CBS didn't base an argument, but I'm happy to go through that. In Action for Children's Television 3, then-Justice Judge Ginsburg said to the majority, look, if we look at Pacifica, we see the same formulation that was at issue in Pacifica. The Supreme Court upheld the Commission's authority under Pacifica, and we don't see any way around that in doing that, they rejected the vagueness charge. I'm sorry, that was in Action for Children's Television 1. But the application had changed since Pacifica. I'm not so sure that you can rely on what the Supreme Court said after Pacifica. At least you had an exception, at least at the very minimum, for fleeting words. Well, I think the contextual analysis has not changed. That fundamental analysis has stayed throughout Pacifica and finds its roots there and continues forward. I don't think there is a vagueness, really a vagueness challenge that can be made here in terms of CBS not being unnoticed, that you could not place nudity on the screen at the end of the Super Bowl halftime show. So I don't see, both as a general matter, I don't see the vagueness challenge, and as a specific matter in this case, I failed to see how they can say that they were under any misimpression. Again, the way to look at this is what if they had scripted this? Could they have come to this court and said, well, look, it was entirely unclear to us. Say Janet Jackson took all of her clothes off at the end of the Super Bowl halftime show, but it was unclear to us that because she did it only for a second that that would be constitutionally subject to nudity. Well, that's another way to deal with the vagueness issue, to make a distinction between scripted material and non-scripted material, newscasts, Super Bowl, and so forth. But I don't think that goes to the vagueness question, Your Honor. I think the Commission is absolutely right, and I think the Supreme Court upheld this form in the analysis saying that it doesn't make any sense, whether from textual analysis or putting all the factors in play, to put some material off the table. And if your objection is that it's vague, I don't know that the indecency analysis is any more vague with regard to unscripted material than with regard to scripted material. But here the Commission has always found that the feeding nature of the material is relevant. And that's, I think, plainly correct, but it doesn't mean that it gives you nothing to pass. And it doesn't mean that it's vague just simply because the Commission has a contextual analysis. The Supreme Court emphasized the Commission's contextual analysis in Pacifica and found, or at least did not address, upheld the policy without regard to whether it's vague. And if, in a sense, the idea is that it's vague because it's contextual, I think that argument is foreclosed by Pacifica. Pacifica holds the Commission's ability to engage in that kind of contextual analysis, even though it may not be precisely clear in every case how the Commission would come out. The Commission has tried to give further guidance, by the way, that 2001 industry guidance was meant to give broadcasters an idea of what the Commission's framework was going to be. And, indeed, the Commission took care in this and other decisions to explain how it comes out in a case-by-case. So really the broadcasters do have a body of law extending over the period of time since the Pacific decision. Which can explain, help them explain or analyze how the Commission would come out in particular cases. But I don't think this is a particularly close case. There was a discussion of Young a little bit earlier. If that was not scripted, it was pretty close to being scripted. And in terms of the fleetingness compared to this particular case, it would seem that they were on different ends of the spectrum. Am I correct in that interpretation? I think there were both tests in the second. The image... Oh, the actual image, yeah. The actual image was both tests in the second. I don't know that Young or the licensee there would agree with your characterization that it was virtually scripted. There was an attempt in Young, I think there was some stupidity involved, but there was an attempt in Young to have the performers perform offscreen. While they were being interviewed, they were in robes, naked underneath. And I guess nobody figured out that if you sit in a chair long enough under hot television lights, when you get up, your robe doesn't necessarily get up your... So I don't know that there's much of a difference there even with regard to the unscripted. I don't think they necessarily intended for the performers there to be exposed. They put in, again, recklessness may apply in both cases because they put the performer in a situation, they put themselves in a situation where this could happen and might very well happen. As here, CBS had a number of indications that it would have been a very good idea for them to have put a video delay in place here. MTV was pushing the envelope. Janet Jackson's choreographer was saying there would be shocking moments. And while they couldn't necessarily have anticipated precisely what would have happened, that's the entire purpose of having a delay system in place. We'll give you some more time. Is there anything else? No, I think I... You might have answered it in your last comment, but I did have a concern about the recklessness standard because when you were discussing it before, you said that CBS omitted doing a number of things that it should have done. You just mentioned the delay. I have an understanding of recklessness, which has to do with their knowledge that there's going to be, for example, nudity displayed, and they said, damn the torpedoes, full speed ahead, we don't care, we'll ignore the risk. That is the kind of recklessness that I'm thinking about. But you're suggesting that if they didn't do A, B, or C, they may be held reckless. Could you elaborate on that? I'd like some refinement. The commission explained in this order that if there were not some kind of duty to take precautions, even when you don't know precisely what would be nudity displayed, you would then allow a licensee to bring together a volatile mix, say, for example, of performances and to ignore warning signs, alarm bells, evidence, simply because they don't know that actually, they're not certain that anything would happen. And then the licensee could simply walk away. So it's as if somebody put together a whole bunch of flammable rags and then decided, I'm just going to walk away from the room or I'm not going to get a fire extinguisher. That suggests to me that because of the people that were involved in this program, CBS was on some sort of notice that something volatile may have happened, may occur. And the commission did identify primarily the statement by Janet Jackson's own choreographer that there's going to be shocking moments. But there were also, the record does show, that the NFL, which was obviously producing the sports event around the halftime show, was intimately involved with CBS in discussing their concerns about what the visual script would be, whether the visual script would be adhered to. There were also comments from other performers about how long the video delay was going to be, which there's an email on the record about, well, that gave MTV folks sort of a scary feeling, as it might have. And there were a number of pieces of evidence that should have put CBS on notice. But our point is, they don't necessarily have to know for certain something bad is going to happen. If they knew for certain this was going to happen, well, they were probably under a much greater duty to make sure that this didn't happen. But if they have evidence that they are running a risk and they proceed, nonetheless, in the face of that risk, not to take an available precaution, then I think the commission is justified in imposing a forfeiture on the grounds that it was both willful and satisfied with the sanitary requirements of the policy. Thank you, Mr. Lewis. Good. Mr. Lewis, thank you very much. Mr. Kornrever. Thank you, Your Honor. I'd like to make just a few points and then answer any questions that you might have. But first, just to answer the question that came up earlier about the vagueness argument, whether or not that was made, the initial brief of CBS at pages 40 to 52 talks about the standardless nature of the FCC's policy  talks about the standardless nature of the FCC's policy also addresses that issue. Secondly, Mr. Lewis, I think, misspoke in his last few minutes on the floor when he talked about questions that came up during the planning of the Super Bowl about the length of the video delay. In fact, there was discussion, as we discussed at length the last time, about imposing an audio delay. There was no discussion of a video delay because no such delay had ever been used in a broadcast in the past, as the commission itself acknowledged in oral argument the last time here. Now, just a few points, and then, of course, I'll answer any questions that you have. I think it's important to notice how the FCC's argument has changed over the course of this case. When it was before you the last time, it argued that the distinction between images and words is obvious in the FCC's policies but unstated. Now, after it has argued the Fox case, its argument is that the policy was stated in 1987, but just not so obvious that the FCC ever cited it in any case until 2006 in a different context. That change in emphasis is critical to understanding how the FCC is involved in a post-hoc rationalization for what its policy was then and what it is now. Secondly, the FCC is wrong when it suggests that the quotation from the 1987 Pacifica order in the Fox decision was critical to the FCC's or to the Supreme Court's decision on the APA. It was not. You can remove that discussion altogether and the Court would reach the same opinion that it did based on its analysis of whether or not the FCC could have adopted that policy in the first place. But is that the test? I mean, once we have a GVR, grant of cert, vacate, and remand, do we need to have found that the matter before us being argued was essential to the holding of the Supreme Court's recent decision? Or can we take an opportunity to rethink and change our mind? Well, certainly the Court has the opportunity to rethink the issue and change its mind. The question is whether or not the Supreme Court's citation of that language goes to the issues that persuaded this Court the last time. And the point is that the Supreme Court was simply looking at that in a different context and never considered whether or not the FCC's policy with respect to images was implicated. And more importantly... I'm sorry. Go ahead. Finish your answer. Well, the Supreme Court itself looked at the FCC's citation of that language and said that it was an irrelevant detour and that it wasn't going to decide the issue presented. It would instead look at the rationale that the FCC gave in its 2006 omnibus remand order. You'll recall that the FCC had tried to argue that the Fox broadcasts would have been indecent even under its prior policy, and it cited the 1987 Pacifica order for that purpose. It also tried to argue that it never had a fleeting explanation of this policy at all, that that was confined to dicta and staff rulings. But again, the Supreme Court reached the decision that it did simply because it found that the FCC's ultimate explanation, where it actually acknowledged its change in policy, was sufficient to survive under APA analysis. Now, Mr. Lewis pointed out the language on 1812 in the Fox decision where the court said in finding the agency's reasons for now treating the isolated non-literal expletives as actionably indecent were, quote, entirely rational, the court talked about how it was reasonable to determine that it made no sense to distinguish between the literal and non-literal uses of the words. And doesn't that seem to support Mr. Lewis's argument here? Well, no, it does support the FCC's decision in Fox where it was actually distinguishing between literal and non-literal uses, but it doesn't explain what happened in the 1987 order and or what the FCC's history had been. And so, again, while that may have been something that the Supreme Court cited in support of its ultimate conclusion, its primary factors for deciding that the FCC's explanation was sufficient were the ones given in the 2006 omnibus remand order that you could conclude that an isolated expletive was offensive and pandering and so on. Finally, it's important to note the constantly changing factors at play here. Mr. Lewis has talked about how in the George Carlin monologue, those were non-literal uses of the word, and yet the FCC itself argued in Fox and has argued, I guess, several times in the course of these two cases that George Carlin's words were not all non-literal uses. This is the example that I was giving about how the FCC is arbitrary in the application of its factors. It defines them one way in one case and feels free to change them in another, and it's a separate independent reason why the FCC's explanation should be invalidated. Thank you. Anything else you would like to say? Anything else? I feel like someone being asked for his last words, but no, I think that covers it. Good. The case was very well argued and very well briefed. We would like to have a transcript made of the argument and ask that you share in that. If you would please check with the clerk's office, they'll tell you how to do that. The court will take the matter under advisement. We thank counsel again.